# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICKY A. AGUAYO,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>　　　　Defendant. | Case No. 1:18-cv-00946-SAB<br><br>ORDER GRANTING PLAINTIFF'S SOCIAL SECURITY APPEAL AND REMANDING FOR FURTHER ADMINISTRATIVE PROCEEDINGS<br><br>(ECF Nos. 17, 18, 19) |

## I.

## INTRODUCTION

Vicky A. Aguayo ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability benefits pursuant to the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from depression, hypertension, subluxation of the temporomandibular joint, obesity, degenerative joint disease of the cervical spine, degenerative joint disease of the right shoulder, obesity, hypertension, and Sjogren's syndrome. For the reasons set forth below,

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge. (See ECF Nos. 9, 12.)

1

Plaintiff's Social Security appeal shall be granted.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed an application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income on June 2, 2014. (AR 83, 95.) Plaintiff's applications were initially denied on December 6, 2014, and denied upon reconsideration on May 8, 2015. (AR 139-143, 147-151.) Plaintiff requested and received a hearing before Administrative Law Judge Ruxana Meyer ("the ALJ"). Plaintiff appeared for a hearing on August 9, 2017. (AR 41-82.) On September 5, 2017, the ALJ found that Plaintiff was not disabled. (AR 16-29.) The Appeals Council denied Plaintiff's request for review on June 14, 2018. (AR 1-4.)

### A.  Hearing Testimony

Plaintiff testified at the August 9, 2017 hearing with the assistance of counsel. (AR 45-71.) Plaintiff is 5' 1 1/2" tall and weighs 220 pounds. (AR 47.) She has gained approximately forty pounds in the last three years due to lack of exercise because of her pain. (AR 47.)

Plaintiff lives with her adult daughter and her grandsons who are 13 and 10. (AR 45.) Plaintiff's daughter is a nurse and works twelve hour days four shifts a week. (AR 45.) The grandchildren go to their father's half-time and they stay at home the days that Plaintiff's daughter is home. (AR 46.) Plaintiff supports herself with general relief and food stamps. (AR 52.)

Plaintiff had her daughter when she was fifteen years old and went to a school age mother program at continuation school. (AR 52.) She completed ninth grade. (AR 52.) When questioned as to why she had put on her application that she completed the eleventh grade, Plaintiff responded she went to school into the eleventh grade but did not complete it. (AR 52.) Plaintiff tried to get her GED but she could not sit because of pain. (AR 52.) The teacher tried getting her a softer chair and Plaintiff could not sit and stand because her back was hurting too bad so she stopped going. (AR 52.)

Plaintiff's daughter brought her to the hearing. (AR 50.) Plaintiff has a driver's license

1 and drove two to three times in the previous month. (AR 51.) Plaintiff drives to FoodMax, that
2 is primarily where she uses her back brace. (AR 51.)

3       Plaintiff worked as a computer operator at the hospital until the department she worked in
4 was dissolved. (AR 53.) All the operators were laid off. (AR 53.) Plaintiff answered phones,
5 did network backup, transferred tape from facility, and facility computer hardware. (AR 53.)
6 Plaintiff walked, stood, and sat eight hours. (AR 53-54.) Plaintiff did a lot of printing of forms
7 and reports and was mostly walking and standing for six hours. (AR 54.) She would be sitting
8 intermittently. (AR 54.) She did light typing and handling of small objects around eight hours.
9 (AR 53-54.) Plaintiff lifted twenty-five pounds frequently and the heaviest weight that she lifted
10 was fifty pounds. (AR 54.)

11       Plaintiff did not look for work after she got laid off because her arthritis, Lupus, and
12 Sjogren's had started to get bad and has exacerbated since she has been off. (AR 55.) Plaintiff
13 has pain through her hands, knees, feet, tailbone, hips, and neck and has a dislocated jaw. (AR
14 55.) When she opens her mouth wide it pops and the back of her tongue will swell up and she
15 gets an earache. (AR 55.)

16       Plaintiff has a cell phone and texts, makes phone calls, and checks her email. (AR 56.)
17 She does not care to play games so she has no games on her phone. (AR 56.)

18       Plaintiff is left handed and has DeQuervain's disorder in both hands. (AR 46.) Plaintiff
19 had surgery on both hands around 2010. (AR 46-47.) Now she no longer wears braces and just
20 has pain from arthritis in both hands. (AR 46.) Plaintiff has pain in her back tailbone area and
21 her knees and feet. (AR 47.) Plaintiff gets burning on the top of her feet and the arch. (AR 47,
22 64.) It is hard to wear shoes or flipflops. (AR 47.) So she does not do much walking. (AR 47.)
23 Plaintiff can walk a half block and it would take her about fifteen minutes. (AR 48.) She walks
24 that every other day if she does not have pain in her feet, knees, or hips. (AR 48.) Plaintiff can
25 sit for twenty minutes at a time and then must stand for about twenty minutes before she sits
26 again. (AR 48.) She can stand for twenty to twenty-five minutes. (AR 48.) The pain in her
27 tailbone and hips feels like she is in labor. (AR 68.)

28       Plaintiff's hands are very tender and she has trouble holding onto things, like when

writing. (AR 64.) She keeps ice on her hands a lot. (AR 64.) Her left hand, the middle finger, is starting to bother her. (AR 64.) Her index finger on her right hand is the worst. (AR 65.) Her right hand is worse than her left hand. (AR 65.) She has pain in her hands daily. (AR 65.) It is hard for her to use cooking utensils and she does not pick up anything heavy. (AR 65.) She will use a small pan rather than a large pan because it is too heavy. (AR 65.) Plaintiff can lift five to eight pounds with her right hand. (AR 65.) She can hold something for maybe five minutes. (AR 65-66.) Plaintiff's left elbow is bad. (AR 66.) At times she cannot pick up her purse because of the pain. (AR 66.) Plaintiff can only pick up five pounds with her left hand and hold it for only two to three minutes. (AR 66-67.) Plaintiff uses both hands to lift a gallon of milk. (AR 66.) After she rests a couple minutes she gets her strength back. (AR 67.) Her pain is worse when the weather is cold and wet. (AR 67.) She has noticed it has even started to hurt in the heat. (AR 67.)

If Plaintiff dropped something she would be able to bend over to pick it up once. (AR 68.) Plaintiff cannot kneel or squat because of her knees. (AR 68.) She does not walk on uneven surfaces because she is afraid. (AR 68.) Plaintiff can walk up a flight of stairs if she has to. (AR 68.)

Plaintiff has a cane, a back brace, and a walker. (AR 48.) She has a prescription from Dr. Ky for the back brace. (AR 49.) Plaintiff was not wearing the back brace at the hearing but does wear it when she is going to mop or going for a walk longer than fifteen minutes or is going to be bending over. (AR 49.) Plaintiff does not have a prescription for the cane or the walker. (AR 50.) She uses the walker when she is going to walk for longer than fifteen minutes so that she has a place to sit. (AR 50.) She used her cane about three times in the previous month. (AR 50.) She used the walker once in the previous month because she usually does not go out for long periods of time. (AR 50.) She used it when she went to the doctor because she had to go up the elevator and then stand in line. (AR 50.)

Plaintiff has a regimen of medication she takes every day. (AR 56.) She does not drive when she takes narcotics because she does not feel safe. (AR 56.) She takes the narcotics as needed and believes that she takes them every day. (AR 56.) Plaintiff took Cymbalta and Xanax

when she got up. (AR 57.) They make her loopy. (AR 57.) Plaintiff cannot have childproof bottles and makes sure her medications have screw on lids. (AR 57.)

Plaintiff uses ice packs and a heating pad for her pain. (AR 58.) She uses the ice packs about every other day and it will take the pain away for a little while. (AR 58.) She uses the heating pad about every other day for her ear. (AR 58.) It will take the edge off for 20 minutes to a half an hour. (AR 58.) Plaintiff will get up and stand and walk around the house, move her legs to alleviate her pain. (AR 59.) She will put on her back brace if her tailbone or hips are hurting. (AR 59.)

Plaintiff cooks herself breakfast, but her daughter does all the heavy cooking. (AR 59.) She will cook for about fifteen minutes and then take a break. (AR 59.) Plaintiff is usually on the recliner or lying on her bed. (AR 59.) Plaintiff tries to do as much cleaning as she can. (AR 59.) She will do a little mopping and sweeping. (AR 59.) She will not do it very long and then will be in pain the next day. (AR 60.) She mops or sweeps once a week. (AR 60.) Plaintiff will do it for fifteen minutes and then take a break and sit down for fifteen to twenty minutes. (AR 60.) Plaintiff spends her day watching television on the couch or lying in bed. (AR 60.)

Some days she is depressed and does not want to get out of bed. (AR 60-61.) There are times where she will not get dressed for a couple of days. (AR 61.) She will feel depressed three days a week. (AR 61.) She has been having this depression for four years. (AR 61.) Plaintiff takes medication for her depression that makes her groggy and sleepy. (AR 61.) The medication does take the edge off her depression. (AR 61.) Plaintiff sees a therapist and a psychiatrist for her depression. (AR 61.) It has helped and has lessened the number of days that she feels this way. (AR 61.) In the past, she was in bed five to seven days a week with her depression. (AR 62.) It has been a year since that happened. (AR 62.) She did not want to get up or open her curtains. (AR 62.) She would not associate with her friends and stopped going to her faith group. (AR 62.) She was not getting treatment at that time. (AR 62.)

Due to her depression, Plaintiff does not want to associate with people and does not like being around too many people. (AR 62.) She will stay in her room when the family gets together. (AR 62.) Plaintiff has difficulty concentrating and can only concentrate for ten to

fifteen minutes before having to take a twenty minute break. (AR 63.) Her depression is associated with her weight. (AR 63.) When she is depressed, she wants to eat or snack. (AR 63.) She has nothing to do so she eats. (AR 63.)

Plaintiff does not keep up with her hygiene. (AR 63.) It is hard for her to brush her hair and her daughters will do her hair for her. (AR 63.) She washes her hair once every other week. (AR 63.) Her daughter will wash her hair for her and braid it or put it up in a ponytail. (AR 63.) Her daughter said they were going to have to cut her hair but she does not want to. (AR 63.) Plaintiff cannot do her hair because she has trouble reaching above her head. (AR 64.)

Plaintiff received shots in her neck and it has been popping the last couple days. (AR 69.) She is going to get shots in her tailbone the following week. (AR 69.) She has been having the injections for a couple years. (AR 69.) They take the pain away completely for a little while, like two weeks and then it starts coming back. (AR 69.) Plaintiff's knees also swell a couple times a month. (AR 69.) They hurt her on a regular basis. (AR 69.) She will have excessive pain in her knees, feet, hips, or elbows a couple times a month. (AR 69-70.) She will have a flare up when she is stressed or due to the weather. (AR 70.) The flareups will last a day or two. (AR 70.) She has times when she has to have help getting up out of bed or off the couch. (AR 70.) She will have her grandsons help her. (AR 70.) She does not shower, bathe, or get dressed during a flareup. (AR 70.) She also will not drive because it is hard to keep her foot on the gas and her whole leg will shake. (AR 70.) She rests more during the day. (AR 70-71.) The back of her knees feel like sandpaper rubbing against it. (AR 71.) That is why she will not sit long on a hard surface because it hurts her legs. (AR 71.)

Plaintiff previously had a medical marijuana card but it is expired. (AR 71.) She was using marijuana before she went to pain management, but she is not allowed to anymore due to the pain contract. (AR 71.)

Kenneth Ferra, a vocational expert, also testified at the hearing. (AR 72-81.)

**B. ALJ Findings**

The ALJ made the following findings of fact and conclusions of law.

- Plaintiff met insured status requirements of the Social Security Act through December

- 31, 2019.
- Plaintiff has not engaged in substantial gainful activity since the alleged onset date of January 30, 2014.
- Plaintiff has the following severe impairments: degenerative joint disease of the cervical spine, degenerative joint disease of the right shoulder, obesity, hypertension, and Sjogren's syndrome.
- Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments.
- Plaintiff has the residual functional capacity to lift 25 pounds occasionally and lift or carry 10 pounds frequently; sit six hours, stand or walk six hours in an eight-hour workday; frequently climb ramps and stairs, balance, kneel, and crouch; occasionally climb ladders, ropes, and scaffolds, crawl, and stoop; frequently engage in bilateral handling, fingering, and overhead reaching; and perform work that affords an option to sit or stand for 15 minutes after sitting or standing for one hour assuming normal breaks and lunches.
- Plaintiff is unable to perform any past relevant work.
- Plaintiff was born on June 1, 1965 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Plaintiff subsequently changed age category to closely approaching advanced age.
- Plaintiff has a limited education and is able to communicate in English.
- Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is not disabled whether or not Plaintiff has transferable job skills.
- Considering Plaintiff's age, education, work experience, and residual functional capacity there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.
- Plaintiff has not been under a disability as defined in the Social Security Act from January 30, 2014, through the date of this decision.

(AR 21-29.)

## III.

## LEGAL STANDARD

To qualify for disability insurance benefits under the Social Security Act, the claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Regulations set out a five step sequential evaluation process to be used in determining if a claimant is disabled. 20 C.F.R. § 404.1520;[2] Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1194 (9th Cir. 2004). The five steps in the sequential evaluation in assessing whether the claimant is disabled are:

> Step one: Is the claimant presently engaged in substantial gainful activity? If so, the claimant is not disabled. If not, proceed to step two.
>
> Step two: Is the claimant's alleged impairment sufficiently severe to limit his or her ability to work? If so, proceed to step three. If not, the claimant is not disabled.
>
> Step three: Does the claimant's impairment, or combination of impairments, meet or equal an impairment listed in 20 C.F.R., pt. 404, subpt. P, app. 1? If so, the claimant is disabled. If not, proceed to step four.
>
> Step four: Does the claimant possess the residual functional capacity ("RFC") to perform his or her past relevant work? If so, the claimant is not disabled. If not, proceed to step five.
>
> Step five: Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow him or her to adjust to other work that exists in significant numbers in the national economy? If so, the claimant is not disabled. If not, the claimant is disabled.

Stout v. Commissioner, Social Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006).

Congress has provided that an individual may obtain judicial review of any final decision of the Commissioner of Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g).

---

[2] The cases generally cited herein reference the regulations which apply to disability insurance benefits, 20 C.F.R. §404.1501 et seq., however Plaintiff is also seeking supplemental security income, 20 C.F.R. § 416.901 et seq. The regulations are generally the same for both types of benefits. Therefore, further references are to the disability insurance benefits regulations, 20 C.F.R. §404.1501 et seq.

In reviewing findings of fact in respect to the denial of benefits, this court "reviews the Commissioner's final decision for substantial evidence, and the Commissioner's decision will be disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v. Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla, but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal quotations and citations omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1457 (9th Cir. 1995)).

"[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill, 698 F.3d at 1159 (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the court's judgment for the ALJ's. See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

## IV.

## DISCUSSION AND ANALYSIS

Plaintiff contends that the ALJ erred in improperly rejecting the opinion of her treating physician Dr. Zaw without setting forth specific and legitimate reasons, by failing to find her depression severe at step two, and not considering the effect of her mental impairments on the residual functional capacity.

### A. Medical Opinion Evidence

Plaintiff argues that the ALJ failed to provide specific and legitimate reasons to reject the opinion of her treating provider, Dr. Zaw. Plaintiff contends that the reasons provided by the ALJ to reject the opinion are not supported by the record and the ALJ failed to discuss the other findings in the medical record. Plaintiff asserts that she has received significant treatment for her lumbar degenerative joint disease and has undergone years of pain management for the condition

and the ALJ did not discuss it. Plaintiff seeks for remand for further administrative proceedings to evaluate her limitations resulting from her medically determinable impairments and proper evaluation of Dr. Zaw's opinion.

Defendant counters that the ALJ was not required to adopt Dr. Zaw's opinion and properly found that it was overly restrictive. Plaintiff proffers that opinion of Dr. Rush as proof that Plaintiff was capable of greater ability than opined by Dr. Zaw. Defendant further argues that Plaintiff only received conservative and effective treatments which are inconsistent with Dr. Zaw's opinion. Further, Defendant argues that the ALJ properly considered Plaintiff's capacity to perform a wide variety of physical activities.

Plaintiff replies that the Commissioner cannot offer post-hac rationalizations and the Court is limited to review those reasons provided by the ALJ in the opinion. Plaintiff argues that the ALJ's decision fails to consider the medical record as a whole and ignores large volumes of evidence that support Dr. Zaw's opinion.

The weight to be given to medical opinions depends upon whether the opinion is proffered by a treating, examining, or non-examining professional. See Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995). "Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(1)-(2)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing 20 C.F.R. § 404.1527(d)(3)). The contrary opinion of a non-examining expert is not sufficient by itself to constitute a specific, legitimate reason for rejecting a treating or examining physician's opinion, however, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). The ALJ need not accept the opinion of any physician that is brief, conclusory, and unsupported by clinical findings. Thomas, 278 F.3d at 957.

The ALJ considered that Plaintiff has degenerative joint disease of the cervical spine and that examination revealed

> a mild tight band mild spasm mild hypertonicity and moderate tenderness along the bilateral cervical paraspinal muscles [AR 817]. The claimant's cervical range of motion was noted to be within normal limits: flexion at 45 degrees, extension at 55 degrees, lateral bending at 40 degrees, and rotation at 70 degrees [AR 462]. A cervical spine x-ray showed a broadbase protrusion with osteophyte at C5-6, a diffuse disc bulge at C6-7, and a right paracentral and lateral recess broadbase protrusion at C4-5 [AR 811-812]. The residual functional capacity accounts for the claimant's cervical impairment by including a lifting and carrying limitation and a sit-stand option.

(AR 25.)

The ALJ also considered Plaintiff's degenerative joint disease of the right shoulder and that a right shoulder rotator cuff disorder was noted. (AR 25.)

> An MRI of the right shoulder showed supraspinatus tendinosis with high-grade intrasubstance/bursal surface tear of the posterior footplate insertion subscapularis tendinosis intra-articular biceps tendinosis and acromioclavicular joint osteoarthrosis [AR 874-875]. The claimant's bilateral shoulder range of motion was noted to be within normal limits: forward flexion at 180 degrees, extension at 50 degrees, abduction at 180 degrees, adduction at 50 degrees, external rotation at 90 degrees, and internal rotation at 90 degrees [AR 462]. Another range of motion test indicated flexion at 110 degrees, abduction at 120 degrees, adduction at 20 degrees, internal rotation at 40 degrees, and external rotation at 40 degrees [AR 889]. Based on this evidence, the residual functional capacity provides for frequent bilateral handling, fingering, and overhead reaching.

(AR 25.)

While the ALJ noted the findings of the consultative examiner and a single finding of a treating physician, there is no discussion of the treatment that Plaintiff received in pain management, including numerous steroid injections, ablations, and blocks. (AR 844-846, 857-861, 870-873, 883-885, 893-895, 925-928, 942-945, 958-961, 980-982, 990-993, 1013-1015, 1023-1026, 1029-1032, 1046.) Further, the ALJ does not appear to have considered Plaintiff's treatment by Dr. Khalid and his diagnosis that Plaintiff had fibromyalgia and rheumatoid arthritis or his findings. (AR 1197-1211.) The ALJ is not required to address every piece of evidence, but she cannot ignore significant or probative evidence. Hiler v. Astrue, 687 F.3d 1208, 1212 (9th Cir. 2012). Despite this pain management treatment, Plaintiff was found to have reduced range of motion and mild to moderate pain on palpation and with movement. (AR 817, 826, 833, 840, 851-852, 864-865, 878-879, 889, 898-899, 914, 921, 932, 938-939, 948-959, 955, 965,

971, 976-977, 986, 997, 1004, 1010, 1019, 1036, 1043, 1199, 1203, 1207, 1211.) The ALJ found that the residual functional capacity assessment accounted for Plaintiff's cervical impairment by including a lifting and carrying limitation and a sit-stand option and her shoulder impairment by frequent bilateral handling, fingering, and overhead reaching, but there is no medical opinion in the record that evaluated the pain management evidence and opined that these limitations would be appropriate for Plaintiff. As a lay person, the ALJ is not qualified to interpret raw medical data in functional terms and there is no medical opinion in the record to support her determination that the residual functional capacity assessment accommodates Plaintiff's impairments. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).

The ALJ gave great weight to the opinions of the agency physicians finding them persuasive (AR 26-27), however, the agency physicians did not review the medical evidence of the pain management treatment and treatment by Dr. Khalid which indicated some more severe findings than those in the prior record.

The ALJ relied on Plaintiff's reported activities to find that she retained greater capacity than that opined by Dr. Zaw. (AR 27.) While there is substantial evidence in the record that Plaintiff retained greater functionality than opined by Dr. Zaw, including her ability to go to Disneyland and Hawaii, help friends move, push her car, and care for her special needs grandson (AR 429, 469, 1135, 1140, 1076), the ALJ did not identify these activities as inconsistent with Dr. Zaw's opinion. The activities relied on by the ALJ, caring for hygiene using email and text features of a cell phone and light cooking and light housework, were generally qualified by Plaintiff as done for limited amounts of time or only occasionally. (AR 27.)

In this instance, the Court finds that the ALJ erred in considering the opinion of Plaintiff's treating physician and this action shall be remanded for further consideration of the medical evidence in determining the limiting effects of Plaintiff's physical impairments.

**B.     Effect of Mental Impairments**

Plaintiff also contends that the ALJ erred in failing to find her mental impairments severe at step two of the sequential evaluation. Plaintiff argues that any improvement in her condition was only temporary and the rejection of her condition as severe was legal error. Plaintiff seeks

12

remand for proper evaluation of her medically determinable impairments.

Defendant counters that the ALJ properly found that Plaintiff's mental impairment was not severe at step two. Defendant argues that the ALJ proceeded to consider Plaintiff's mental impairments in developing her residual functional capacity assessment and the record as a whole supports the finding that she did not have a severe mental impairment.

Plaintiff replies that the ALJ did not discuss her mental impairments in developing the residual functional capacity and therefore any error at step two is not harmless.

"At the second step of sequential evaluation, . . . medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities. If this assessment shows the individual to have the physical and mental ability(ies) necessary to perform such activities, no evaluation of past work (or of age, education, work experience) is needed. Rather, it is reasonable to conclude, based on the minimal impact of the impairment(s), that the individual is capable of engaging in SGA." Titles II & Xvi: Med. Impairments That Are Not Severe, SSR 85-28 (S.S.A. 1985).

"An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual[']s ability to work.'" Smolen, 80 F.3d at 1290 (citations omitted). Step two is a "de minimis screening devise to dispose of groundless claims." Id. An ALJ can only find that claimant's impairments or combination of impairments are not severe when his conclusion is clearly established by medical evidence. Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (quoting S.S.R. 85-28). In considering an impairment or combination of impairments, the ALJ must consider the claimant's subjective symptoms in determining their severity. Smolen, 80 F.3d at 1290.

Symptoms are not medically determinable physical impairments and cannot by themselves establish the existence of an impairment. Titles II & Xvi: Symptoms, Medically Determinable Physical & Mental Impairments, & Exertional & Nonexertional Limitations, SSR 96-4P (S.S.A. July 2, 1996). In order to find a claimant disabled, there must be medical signs and laboratory findings demonstrating the existence of a medically determinable ailment. Id.

"[R]egardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings . . . . In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, the individual must be found not disabled at step 2 of the sequential evaluation process." Id.

In considering the severity of Plaintiff's mental impairments, the ALJ found that Plaintiff had a history of marijuana addition but was currently in remission. (AR 21-22.)

The ALJ considered that Plaintiff had been treated for depression by Dr. Ziyar who opined in 2013 that Plaintiff had minimal ability to perform her work duties. (AR 22, 370.) Plaintiff had been prescribed medication and Dr. Silva had opined that Plaintiff had depression with "wild exacerbations of her concentration" and had been incapacitated for four months in 2013 which was expected to flare up once a month for one to two hours. (AR 22, 1121-1122.) The ALJ also considered that Dr. Silva indicated that Plaintiff's depression was a lifelong condition but that Dr. Ziyar indicated that the condition would last from June 2013 until January 2014. (AR 22, 394, 1121.)

The ALJ further considered that Plaintiff was treated by the House Psychiatric Clinic during 2016 and 2017 and records indicate that her symptoms were stable, she was seeing a therapist weekly with no side effects from her medications. (AR 22, 1130-1187.) While noted to be stable, on occasion Plaintiff's symptoms were mild to moderate (AR 1154, 1159, 1174), but were generally found to be moderate (AR 1130, 1135, 1140, 1149, 1164.) Plaintiff's examination findings are generally unremarkable, but it is noted that she is distractible and her thoughts were preoccupied during the time period that she was preparing to move in with her daughter and around the time of her trip to Hawaii. (AR 1132, 1137, 1143, 1146.)

Additionally, the ALJ did not address the opinion of NP Beattie on March 30, 2016 that it was reasonable to think that Plaintiff would be able to return to work part time in six months and full time in six months. (AR 1181.)

The Court finds that Plaintiff submitted sufficient evidence to meet the de minimis

standard at step two to find that her depression was a severe impairment. While Defendant argues that any error at step two would be harmless as the ALJ went on to consider Plaintiff's residual functional capacity, the ALJ did not further consider the effect of Plaintiff's mental condition in discussing her residual functional capacity.

The Court finds that the ALJ erred in finding that Plaintiff's mental impairments were not severe at step two. Accordingly, remand is appropriate for the ALJ to determine if Plaintiff's mental impairments have any effect on her residual functional capacity.

## V.

## CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ erred in evaluating the opinion of Dr. Zaw and in finding Plaintiff's mental impairments non-severe at step two of the sequential evaluation process. Accordingly, IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the Commissioner of Social Security is GRANTED and this matter is remanded back to the Commissioner of Social Security for further proceedings consistent with this order. It is FURTHER ORDERED that judgment be entered in favor of Plaintiff Vicky A. Aguayo and against Defendant Commissioner of Social Security. The Clerk of the Court is directed to CLOSE this action.

IT IS SO ORDERED.

Dated: **June 28, 2019**

UNITED STATES MAGISTRATE JUDGE